Filed 8/21/24  In re N.M. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re N.M., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,  Plaintiff and Respondent,        v. C.H.,  Defendant and Appellant. | G063839 (Super. Ct. Nos. 20DP1545, 20DP1545A) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Julie A. Swain, Judge. Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*          \*          \*

This is an appeal by C.H. (the mother) of dependent child N.M. (the child) after the juvenile court terminated parental rights. She argues the court erred by failing to invoke Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i),[1] the parental benefit exception, and section 366.26, subdivision (c)(1)(B)(v), the sibling benefit exception, to prevent the termination of parental rights. The court found the mother had not met her burden as to either exception. The mother argues she satisfied her burden and the court's findings to the contrary must be reversed. We find no error and therefore affirm the court's order terminating parental rights.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

Because of the very limited issues on appeal, our statement of facts is limited to those issues. We have, however, reviewed the entire record.

The mother's two children, N.M. and S.D., were detained in December 2020 based on allegations of general neglect and domestic violence between the mother and her boyfriend, Richard D. (Richard). N.M. was six years old at the time and S.D,[2] his sister, was 10 years old. N.M was placed with his father, A.M. (the father). The petition alleged jurisdiction under section 300, subdivision (b)(1). The detention report prepared by the Orange County Social Services Agency (SSA) stated that the mother had full custody of S.D. and shared custody of N.M. with the father. At the detention hearing, the court ordered N.M. to be detained from the mother, with custody granted to the father. Later, on December 30, SSA filed an amended petition adding

---

[1] Subsequent statutory references are to the Welfare and Institutions Code.

[2] Because S.D. is not involved in this appeal, we mention her only as relevant to the issues on appeal.

allegations against the father, specifically a history of and current substance abuse issues as a user of methamphetamine.

While in his father's custody, N.M. lived with the father, his parents (the paternal grandparents), and the young child the grandparents were in the process of adopting, G. The mother's visits during this time frame seemed to go reasonably well. The social worker had told the paternal grandmother, S.M., that if a visit was going well, she could extend it. S.M. stated that she had offered this previously but the mother would decline and leave.

At a visit in late January or early February, S.M. reported that at the end of the visit, the mother asked N.M. for another hug, but the child refused and began running around. S.M. reported that the mother said: "'I am not coming to visit you anymore. I am not going to do long visits or 3 hours with you anymore. I am not going to pick you up from school anymore if you do this.'" S.M. later asked the child why he did not want to hug the mother. He said, "'I already did, why do I need to do it again? Mommy says she's not going to visit me anymore.'" The child seemed fine the next day, but S.M. could not get the mother to commit to her next visit. Generally, N.M. was doing well with his placement. He informed the social worker that he loved visits with his sister and mother.

At some point, things changed. On February 19, S.M. reported that N.M. has been "frustrated and angry" toward the mother during visits, and had been hitting and biting the mother when frustrated. S.M. noticed the mother had been attempting to use language from parenting classes to help with this behavior. The mother had not been calling N.M. at the agreed upon time on non-visit days.

At the jurisdiction hearing on February 16, 2021, the court assumed jurisdiction, and the petition was amended somewhat. A disposition hearing was set.

On February 22, during a visit with the mother and S.D., N.M. began to get upset at the end of the visit and began acting out, running away from the mother and hitting and kicking her. The mother told the social worker she believed N.M.'s behavior toward her was because he played video games and had learned violence. When asked, she denied that witnessing domestic violence might have influenced N.M.'s behavior and stated it was due to video games. The mother requested a new visit supervisor and the social worker reviewed the options with her.

At the disposition hearing on March 5, the court found clear and convincing evidence of the need to remove N.M. from the mother. The court ordered the child placed with his father with family maintenance services. The placement with the father was contingent on the father continuing to live with the parental grandparents. A case plan and recommended visitation schedule for the mother was approved.

During the next review period, it became evident that the father had not followed through on his own case plan. His referrals were eventually terminated. Eventually, SSA served a protective custody warrant, under which N.M. would stay in the home with the paternal grandparents and the father would be required to move out. The father was visibly angry and could be heard yelling at S.M. He shouted profanities at the social worker, and S.M. later informed the social worker the father had ripped up the protective custody warrant. SSA filed a supplemental petition as to the father. The court sustained the petition, removed N.M. from the father, and placed him with the paternal grandparents.

Meanwhile, the mother continued to visit N.M., experiencing what she referred to as "many struggles" due to his outbursts and anger. In May, the mother reported that visits "'usually start out good and then turn out bad in the end.'" She explained that N.M. would start to have an attitude toward the end of visits, and would not want to play anymore. She blamed N.M.'s attitude on the father and S.M. not being "on the same page." S.M. stated that the mother often brought activities to visits, but was at times inappropriate and negative. In June 2021, she reported she had "a 'very bad visit'" and another visit in July did not go well.

After a court hearing in July, the mother was authorized to have two hours a week of unsupervised visits. During the following review period, SSA had concerns that the mother was continuing to engage in a relationship that included domestic violence, which she continued to deny.

As to the visits themselves, on August 18, N.M. reported that the mother "would bring games and toys for them to play with. During visits with him and his sister, they would all play together, and he generally had a good time. He recalled a visit where he and the mother had gotten into an argument about a game they were playing, and the child got sent to his room. During the argument, he went in and out of the room multiple times, and he recalled the mother hitting him on the bottom with her hand. He was upset and did not want the visit to continue and gave the mother attitude for the rest of the visit. He recalled another visit that ended up with him being sent to his room to calm down and stated that his mother called him mean and ungrateful, and that it hurt his feelings. The child reported that some visits with his mother are good, and some are bad."

"On September 9, 2021, the caregiver informed the [social worker] that during a recent visit, the mother and child . . . argued for an

excessive amount of time regarding the . . . game that they were playing. The child had expressed to the mother that he did not want to play the game, but mother was insistent, resulting in them being upset with each other. The mother attempted to send the child to his room multiple times, but the child did not want to listen to the mother, prompting more arguments. The caregiver reported that the rest of the visit was "very awkward," with the mother insisting on playing with the child [S.D.] more than [N.M.], making the child even more upset. The caregiver reported that at one point, the mother asked [N.M.] 'how does it feel like to be ignored?' and that it made the child very upset."

On September 16, S.M. reported that another "visit was very difficult due" to the mother and child "getting into arguments" and N.M. having tantrums. N.M. stated that "he hated the mother, and that she was not his parent." The mother believed N.M.'s behavioral problems were "because she tells him one thing and paternal grandmother tells him something else. The mother is concerned that her and paternal grandmother are not on the same page when it comes to discipline, resulting in him getting confused and acting out. The [social worker] instructed the mother to communicate with grandmother and clarify what the disciplinary actions should look like."

A few weeks later, the social worker spoke to S.M. about a visit that took place on September 30. S.M. stated that "the visit that occurred at the home was going well until [he] and the mother were playing outside and mother got upset at the child dumping out a new water bottle onto [a] tree. The mother instructed the child to go inside, where the argument continued. The child attempted to verbalize his feelings to the mother and stated, 'I feel like I hate you.' The caregiver stepped in and asked the child to apologize to

6

the mother, and the child apologized. The mother did not accept the apology and ended the visit in a rush, stating that the child could call her when he apologizes correctly. The child was emotionally distraught following the visit and had to calm down by riding his bike outside. The child attempted to call the mother back later on in the evening and the mother did not answer. The caregiver reported that the child was able to get in contact with the mother before bed, and that she facetimed him from inside her car."

"On October 7, 2021, the caregiver reported that during the mother's unsupervised visits, the mother does not plan activities and she and the child went to the park and he rode a bike for 30 minutes before returning home. The child and mother played in the living room for the remainder for the visit. Caregiver explained that unsupervised visits don't occur in the community, and that she ends up supervising a majority of the visit in the home."

Visits thereafter were supervised by various social service workers. Some visits appeared to go well while others were problematic. N.M. "expressed that he sometimes gets afraid during visits at new locations, because he does not know if the caregiver is going to return to pick him up or if he is going to stay with the mother. He has been encouraged to speak to the mother about his emotions, but the caregiver reported that once he is with her at visits, he is quiet and expresses his discomfort by throwing a tantrum." S.M. "got the child ready for the visit the night before by letting him know where the visit will be and from what time. The child often expresses his excitement for the visit beforehand, but then does not want the caregiver to leave. She often has to ensure that she will return to pick him up and sneak away when the child is distracted. The mother tried to bribe the child and tell him about the activities she has planned, and it occasionally worked in her

favor. The child comes back from the visits happy and tells her about the games that he and the mother play."

Communication on non-visit days was described as "slim," and mainly through the use of Facebook Messenger. "She will ask the child what he is doing, he replies back using audio chat or video chat. The mother will occasionally facetime the child and ask what he is doing or ask what they should do at their next visit." In December, S.M. "reported that the child is getting used to visits with the mother being at the visitation centers but expressed anxiety and shyness during unsupervised visits. The child and caregiver would arrive early to unsupervised visits, and the child would often express excitement to play and spend time with the mother. Once the time comes, the child would begin to get shy and ask the caregiver to stay with them for the duration of the unsupervised visit. It takes approximately 10 minutes to calm the child down and for her to leave. After visits, the child would share that he had fun. The caregiver reported that the child has not mentioned many arguments between him and the mother." N.M. was otherwise happy and well with the paternal grandparents. He wanted to remain with his grandparents.

The mother reported she was learning a lot from her parenting coach and attempting to implement what she had learned during visits, "including providing incentives and rewarding appropriate behavior. She shared she was trying to engage in meaningful conversation with both of her children and encourages them to express themselves. She was ignoring the child's tantrums when he didn't get what he wanted and followed through with consequences. She showed up prepared with activities during the visit and provided him with options."

In January 2022, SSA learned that the mother had been instructing S.D. to lie about the condition of her vehicle, and visits were reverted to supervised until it could be confirmed that the mother had repaired the vehicle.

On April 5, 2022, the court ordered continued services. During the next review period, there were numerous reports that she continued to have contact with Richard. The mother denied it. The mother made no progress in her services. Numerous referrals were canceled due to the mother's lack of participation.

The mother was authorized eight hours of supervised visits. As of June 2022, visit monitors reported that visits went generally well, with the mother and N.M. watching television or movies together, playing board games, coloring, or playing outdoors. The mother was appropriately affectionate and N.M. reciprocated.

In July 2022, the mother missed multiple visits, which upset N.M. The mother was also prevented from contacting N.M. on Facebook because "the child had become upset due to the subject nature of her video calls." The social worker had attempted to contact the mother about this, but the mother claimed she did not get any call. N.M. expressed that he did not wish to visit S.D. with the mother present, but wanted to see his sister. The mother was resistant to any changes to the visitation schedule.

N.M. loved to visit with his sister, which S.M. would facilitate. He was doing very well in his placement.

In the beginning of 2023, no concerns were reported by the visitation center. The mother and N.M. spent their time doing crafts, watching movies, and eating together.

In April 2023, pursuant to a negotiated settlement, formal reunification services were terminated, but the mother was provisionally offered further services until the section 366.26 hearing. The paternal grandparents were granted de facto parent status. The court ordered a bonding study between the mother and N.M. and set a section 366.26 hearing.

In June 2023, the mother missed three visits. She could not be located to provide her with notice of the section 366.26 hearing. SSA made a diligent search and exhausted all possible leads as to her whereabouts. The court found that SSA had exercised diligent efforts to locate the mother, and over the objection of counsel, confirmed the date for the section 366.26 hearing as August 16, 2023.

On June 21, SSA informed the court that the mother had given birth to a baby boy. The mother tested positive for methamphetamine upon admission to the hospital, but denied prenatal drug use. She was described as under the influence as evidenced by her behavior. The reported father was Richard, the mother's longstanding partner and alleged domestic abuser. SSA detained the child.

SSA's section 366.26 report stated that N.M. "presents as an active and playful 9-year-old boy as evidenced by his willingness to engage with his caregivers, younger foster sibling, and various activities such as drawing, playing with friends and his openness in conversating. [¶] . . . The child has been observed as having a close bond with his younger foster sibling, G[.], the paternal grandparents adopted 4-year-old boy."

N.M. was doing well in school and attending regularly. He had not been assessed as needing any mental health services. N.M. told the social worker that he liked living with the paternal grandparents "and would like to

10

stay in his current bedroom forever. During monthly visits, the undersigned observed the child to be comfortable in [his] placement, moving around the home with ease and interacting with the paternal grandmother affectionately and confidently. He is able to speak to the caregiver[s] . . . with ease about what is bothering him or if he needs something. The child's educational and behavioral needs are being met on a continuous basis."

Adoption had been discussed with N.M., and he expressed he wanted to be adopted. He understood that adoption meant he may not see the mother, but stated that was "'okay.'" While he loved the mother, he felt safe with her "'only at visits.'" During an interview in late June, N.M., when asked about visits said, "'I dunno, I don't really feel like going.'" Upon further inquiry, he said that during joint visits with his sister, "'well sometimes mommy doesn't really pay attention to me and she and [S.D.] talk a lot of whispering.'" He was upset the mother had not told him about her pregnancy. Since the baby had been born, N.M. did not want to visit because "'she only sees me after seeing the baby and at our last visit, she didn't bring anything for me, it was all for the baby.'"

The social worker observed the mother's visit with N.M. and S.D. on July 20. "The mother appeared to be engaged with both children; she brought snacks and food such as macaroni and cheese, arts and crafts, water bottles with water. She was observed as able to address both children with ease including taking a pause to ensure she was listening to both children as they shared their day with her." When asked about the visit, N.M. said he felt good because he was here with his sister. When asked if he wanted individual visits with his mother, he answered, "'[n]ope.'" When asked why, he said, "'I just don't.'"

SSA assessed the situation regarding visits: "During this supervisory period, the mother has maintained and/or attempted to maintain visitation with the child, except for approximately three to four no-shows. Whilst the mother has been observed during visitations with the child as appropriately engaged and has brought snacks, food, arts, and crafts, her visitation throughout the life of the case has been inconsistent. The child has recently begun declining individual visitations with the mother and reported feeling upset that the mother was allegedly not prepared for visitations with him following visits from another child."

N.M. began attending visits only when S.D. was scheduled to be present. Starting in September 2023, N.M. began to refuse all visits with his mother and requested visits with S.D. without the mother present. The social worker reported: "[T]he child has no interest in any visitation with the mother." SSA continued to encourage and engage the child in visits with the mother. N.M. "inquire[d] as to 'when' he [could] be 'adopted.'"

During this period, the mother's referrals for services had been terminated due to her failure to respond.

Overall, N.M. had been out of the mother's care for approximately two years. His caregivers were able to provide the child with care suitable to his needs and were committed to adoption. "Furthermore, the child has been observed as having an intimate bond with his caregiver[]s and his adopted younger uncle with whom the child has known since the child was adopted. It is in the opinion of the Agency that the child's best interest lay in being adopted by the prospective adoptive parents and current caregivers. The undersigned respectfully recommends that parental rights be terminated to facilitate the most permanent and suitable plan for the child." In its adoption assessment, SSA reported that N.M. was likely to be adopted,

12

and that the benefit of continuing his relationship with the mother would not outweigh the benefits of adoption. N.M. and S.D. shared a close bond, but the paternal grandparents were willing to continue sibling visits postadoption.

The bonding study, based both on clinical observation and testing, indicated that N.M. was a "happy, bubbly, enthusiastic young man who loves his life and is content with his family life. He expresses a very close connection with the *de facto* parents . . . , and with his young foster brother, G[.], where they obviously enjoy being with each other."

As to the mother, N.M. "generally described his mother as someone with whom he feels bored, suggesting he experiences the visitation situation as limiting. But when asked what he remembers about living with her, he again generalizes to feeling they were always at home. In a projective measure about how he views his mother, he suggested if people were animals she would be an unspecified *scary* animal of some kind. He would not want to ask her to go on a long trip with him. He vaguely says living with her was '*a bad time*' but did not want to elaborate about this and I did not push him. He likes seeing his half-sister when they visit together and wishes he could see his sister without his mom. His responses on the maternal measure place him in a below-average range in terms of the degree of connection with mom compared to other youngsters across the U.S. who have taken this test. He does not seem to feel that he would experience it as a loss not to see her. His report on this measure is fairly consistent with what he says in interview about his sense of closeness with her. Mother's report is significantly higher than that reported by the minor. Her interview discussion of their difficulties is more frank and probably a better measure than this score where she rates a higher emotional connection between them."

The evaluator observed a visit between the mother, S.D., and N.M. She assessed that the mother was "extraordinarily well-prepared with unbelievably good food and all manner of toys and crafts. [N.M.] on one level seems positive toward her but there is an undercurrent of hostility that is literally played out throughout the hour. Sometimes she just tolerates it but he is persistent. He displays a very conflicted attachment style toward her."

During their interview, N.M. told the evaluator that he would "like it" if he did not have to see his mother anymore, because "I do not really like having visitation." (Italics and boldface omitted.)

In terms of assessing the legal factors, the evaluator referred to the mother's visitation as "somewhat irregular." As to whether the child would benefit from continuing the relationship, the evaluator opined: "Depending on the parameters set out for continuing, [N.M.] could benefit, assuming that communications and parameters of contact would remain appropriate and not put him a situation where his current level of stability is compromised." As to whether termination of the relationship would impose a detriment on N.M., the evaluator stated: "Based on all the information presently available to me, I do not believe it would be a detriment if the relationship is terminated."

The section 366.26 hearing was contested and conducted over several days in October and December 2023. The court received the bonding study, among other documents, into evidence.

N.M. testified. He stated that during his visits with the mother, they would play games and eat. She had brought toys and books. They celebrated with cake for his birthday, and she brought him a toy he liked as a birthday gift. He liked seeing his mother, was excited to see her, and would sometimes give her a hug or tell her he loved her. He was not sad at the end

of visits. He did not want increased visitation, stating that "two times a week is enough." N.M. looked at some photos of past visits and said he was happy, or "look[ed] happy," during those times. He wanted to see S.D. and his infant brother "a lot."

When asked if he loved his mother, N.M. answered, "Kinda." When asked why, he said it was because she sometimes brought food to visits that she knew he did not like, and called him a nickname he did not like.

N.M. wanted to be adopted. When told there would be no more court-ordered visits with the mother if he was adopted, N.M. said he would like that because he liked staying home with the paternal grandparents, having fun, and going places. He did not know if he would miss seeing the mother, but thought it would be fine not seeing her. He had made adoption a goal for himself because he did not want to live with his mother or his father.

The evaluator who conducted the bonding study testified in a manner consistent with her report. She described N.M.'s feelings toward the mother as "conflicted." She believed N.M.'s unresolved conflict with the mother had started before he was removed, possibly due to the men with whom the mother had been involved, including the father. During her observed visit, she felt the mother was "remarkably good" given the limits of the visitation center.

The evaluator could not conclude it would be detrimental to N.M. if the relationship was severed, and in her view, N.M. was better off with the paternal grandparents than with the mother. As to S.D., the evaluator opined that she and N.M. had a strong sibling bond. Their relationship, she believed, should be maintained.

The social worker testified in a manner consistent with SSA's reports. Her assessment was that N.M. was adoptable and adoption was in his best interests.

S.D. also testified about her close relationship with N.M. and her desire to spend more time with him.

The mother also testified, objecting to the termination of parental rights because she believed she and N.M. had a good relationship. She claimed S.M. had tried to "ruin" this relationship since she was pregnant with him and had done everything she could to make N.M. "hers." She testified N.M. was excited to see her at visits. They would play games and talk.

The mother admitted that recent visits had not gone well, and for several months, N.M. had refused their individual visits before he stopped coming to visits altogether. She believed that this was due to missed visits due to her pregnancy, and she had apologized to N.M. She did not understand why he had begun refusing visits with her, because they had "always had really good visits." The mother believed S.M. was influencing N.M. not to attend visits. Despite N.M.'s refusal to visit, she nonetheless believed it would be hard on him if their relationship was severed because they had a strong relationship. With respect to S.D., the mother did not believe the paternal grandparents would facilitate visitation after adoption.

After the close of evidence, the mother's counsel argued that the parental benefit exception and sibling exception to adoption should be applied.

After reviewing the evidence, the court found that N.M. was adoptable, and that the parents had not met their burden on either exception.

The court terminated parental rights and ordered adoption as the permanent plan for N.M. The mother now appeals.

## DISCUSSION

### I.

### THE PARENTAL BENEFIT EXCEPTION

"If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) The purpose of the section 366.26 hearing is to select a permanent plan for the child. (*Id.* at pp. 630–631.) Section 366.26 lists permanent plans in order of preference, and adoption is the preferred permanent plan. (§ 366.26, subd. (b)(1); *In re Edward R.* (1993) 12 Cal.App.4th 116, 121–122.) The court must first find by clear and convincing evidence that the child is likely to be adopted. (§ 366.26, subd. (c)(1).) If the court does so, and services have already been terminated, the court then terminates parental rights to permit adoption. (*Caden C.*, at pp. 630–631.)

The exception to this rule is if the parent shows that one of several statutory provisions applies. (§ 366.26, subd. (c)(1)(B)(i)–(vi), (4)(A).) "[I]f the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, *supra*, 11 Cal.5th at pp. 630–631.) The parent bears the burden of establishing the exception applies. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418–1419.)

17

One of these is the parental benefit exception. "From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 631–632.) This is a high standard to meet on appeal. The beneficial relationship exception to the termination of parental rights "may be the most unsuccessfully litigated issue in the history of law." (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1255, fn. 5, disapproved on other grounds by *In re Zeth S.* (2003) 31 Cal.4th 396, 413–414.)

The first two elements of the court's analysis are reviewed for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) "[W]e presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 640; *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947.) "The [court's] determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'" (*Caden C.*, at p. 640.)

The final step, determining whether termination of parental rights would be detrimental to the child is reviewed for abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) "Review for abuse of discretion is

subtly different [than substantial evidence review], focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."""" (*Ibid.*) "[T]he practical difference between the standards is not likely to be very pronounced." (*Ibid.*) "At its core, the hybrid standard . . . simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.'" (*Ibid.*)

As relevant here, the first prong of the benefit exception requires regular visitation and contact. (*Caden C., supra*, 11 Cal.5th at pp. 631–632; *In re Beatrice M., supra*, 29 Cal.App.4th at pp. 1416–1417.) The lower court focused its ruling on the second and third prongs of the analysis, apparently finding, without explicitly stating, that the requirement of regular and consistent visitation had been met. SSA does not challenge this implied finding on appeal.

If visitation and contact is sufficient, the court must next determine whether a beneficial relationship exists. The focus in doing so is on the child. (*Caden C., supra*, 11 Cal.5th at pp. 632–633.) The mother acknowledges she is required to show more than "a friendly and loving relationship, an emotional bond, or pleasant visits." The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at p. 632.) In *Caden C.,* the court held that "the

19

parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Id.* at pp. 636–637.)

The *Caden C.* court referred to *Autumn H.*, *supra*, 27 Cal.App.4th 567, as "the seminal decision interpreting the exception." (*Caden C.*, *supra*, 11 Cal.5th at pp. 631–632.) In determining the existence of a beneficial relationship, we look to "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*Autumn H.*, at pp. 575–576.) The court must also find that the strength of the parent-child relationship outweighs the potential benefit of adoption. (*Id.* at p. 575.)

Here, the court considered evidence from the bonding study, the bonding study evaluator, N.M., the mother, and the social worker. The evidence was overwhelming that N.M.'s feelings toward and bond with the mother were "conflicted," as the evaluator described it. He had recently been refusing all visits with the mother, including visits with his siblings that he had previously enjoyed. When he did visit the mother, he was not sad when the visits ended. He did not want to live with her, but wanted to be adopted. N.M. "[k]inda" loved the mother, but he would be fine with not seeing her any longer. Their relationship was at best mixed, from N.M.'s point of view, and his most recent feelings were negative. In short, there was substantial evidence from which the court could conclude that a beneficial relationship as contemplated by the statute and *Caden C.* did not exist. The mother did not demonstrate the type of "substantial, positive, emotional attachment to the parent" that the law requires. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636–637.)

The court was not required to continue the analysis past the second prong if the mother failed to meet her burden. But if it had, it was not

20

an abuse of discretion for the court to find the mother also failed to meet her burden on the third prong. In the third prong of the analysis, which focuses on "whether 'termination would be detrimental to the child due to' the relationship — the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) In doing so, "the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at pp. 631–632.) Here, the bonding evaluator testified that she could not conclude detriment to N.M. would follow if the parent-child relationship was severed, and further, the child was better off with the paternal grandparents. We find no abuse of discretion in the court's determination that the stability of an adoptive home would outweigh any benefit of continuing the child's relationship with the mother.

## II.

### THE SIBLING EXCEPTION

The court may not terminate parental rights when "[t]here would be substantial interference with a child's sibling relationship . . . ." (§366.26, subd. (c)(1)(B)(v).) The court must consider "the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (*Ibid.*)

21

We apply the substantial evidence standard of review on appeal. *(In re L.Y.L., supra,* 101 Cal.App.4th at p. 947.) The mother has the burden of establishing the sibling exception. (*Id.* at p. 952.)

There was substantial evidence to support the court's ruling that the sibling exception did not require a permanent plan other than adoption in this case. It was undisputed that N.M. and his sister have a bond, but there was substantial evidence that freeing N.M. for adoption would not interfere with their relationship. "'[U]nlike the parent-child relationship, sibling relationships enjoy legal recognition after termination of parental rights.' [Citation.] Thus, it is not a foregone conclusion that terminating parental rights will substantially interfere with a sibling relationship, and the juvenile court must make this factual determination." (*In re D.O.* (2016) 247 Cal.App.4th 166, 175, fn. omitted.)

S.M. committed to furthering future contact, and there was no evidence she intended to sever the relationship between N.M. and his sister. The mother's testimony to the contrary was pure speculation, and obviously impacted by her highly negative opinion of S.M. The court was within its discretion to disregard it. S.M.'s assurances provided the substantial evidence the law required. There was no error.

## DISPOSITION

The court's order is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


DELANEY, J.